JONATHAN K. THORNE (Utah Bar No. 12694)
**SCHOLNICK THORNE HOLLAND**
40 South 600 East
Salt Lake City, Utah 84102
(t) 801.359.4169
(f) 801.359.4313
email: Jonathan@utahjobjustice.com

MARCUS MIGLIORE (*pro hac vice motion forthcoming*)
THOMAS CIANTRA (*pro hac vice motion forthcoming*)
M. ANTONIA BIRD (*pro hac vice motion forthcoming*)
CONSTANCE CHANG (*pro hac vice motion forthcoming*)
**AIR LINE PILOTS ASSOCIATION, INT'L**
7950 Jones Branch Drive, Suite 400S
McLean, VA 22102
(t) 703.481.2447
email:  Marcus.Migliore@alpa.org
        Thomas.Ciantra@alpa.org
        Antonia.Bird@alpa.org
        Constance.Chang@alpa.org

---

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL<br><br>    Plaintiff,<br><br>-against-<br><br>BREEZE AVIATION GROUP, INC.<br><br>    Defendant. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**JURY DEMANDED**<br><br>Civil Action No. |

### INTRODUCTION

1.      An air carrier under the Railway Labor Act ("RLA" or the "Act") 45 U.S.C. § 151 *et seq.*, must "exert every reasonable effort" to "make and maintain" agreements with the representative of its employees by "settl[ing] all disputes, whether arising out of the application of such agreements or otherwise…." 45 U.S.C. § 152, First. This duty to make every reasonable

effort to "treat," or negotiate in good faith, arises out of multiple sections of the RLA, 45 U.S.C.
§ 152, First, Second, Third, Fourth, and Ninth. This duty to bargain is the heart of the RLA and is
designed to provide a collective bargaining process to avoid labor disputes and attendant
disruptions to commerce. Air Line Pilots Association, International ("ALPA" or the
"Association") brings this suit against Breeze Aviation Group, Inc. ("Breeze" or the
"Company"), as Breeze has engaged in a pattern and practice of bad faith bargaining and illegal
conduct since the day ALPA was certified as the Breeze pilots' representative and continuing
through to the present. Breeze is acting in contravention of its RLA obligations. It is motivated to
block the path to a first collective bargaining agreement for the pilots, to undermine ALPA and
the RLA bargaining process, and ultimately to cause the decertification of ALPA.

2.      Breeze's unbroken course of bad faith anti-union conduct began in 2022 when it filed
a baseless challenge the same day the National Mediation Board ("NMB") certified ALPA as the
representative of Breeze pilots. *Breeze Aviation Grp. v. Nat'l Mediation Bd.*, No. 2:22-cv00514-
TC-JCB, 674 F. Supp. 3d 1045 (D. Utah May 23, 2023) (ALPA granted intervenor status), *aff'd*,
104 F.4th 1211 (10th Cir. 2024). Since this Court dismissed that effort to remove ALPA, Breeze
has continued to fight ALPA every step of the way, obstructing negotiations for a first collective
bargaining agreement ("CBA") and undermining ALPA as the pilots' representative by: engaging
in surface bargaining; disregarding any agreements reached with ALPA; creating non-ALPA pilot
committees akin to company unions; dealing directly with employees rather than through ALPA;
unilaterally implementing policies and practices without bargaining with ALPA; and denigrating
ALPA in repeated and public demonstrations of anti-union animus. Breeze leadership has said
that the purpose of all its bad-faith conduct is to push ALPA's Breeze unit to de-certify.

3.     As a result, three years have passed and ALPA and Breeze are still in negotiations for an initial CBA with no first contract in sight.

4.     ALPA seeks a judgment confirming that Breeze has bargained in bad faith in violation of the RLA. In addition, ALPA seeks an affirmative injunction compelling Breeze, in accordance with its obligations under the RLA, to: (1) bargain in good faith with ALPA; (2) cease its interference with the pilots' exercise of their organizational rights; (3) cease its efforts to undermine and destroy ALPA's standing, effectiveness, and functioning as the pilots' chosen bargaining representative; (4) cease its direct dealings with its pilots rather than through ALPA; and (5) cease addressing mandatory topics of collective bargaining through Company-sponsored committees, rather than through ALPA.

## PARTIES

5.     ALPA is an unincorporated association organized for the purposes and objectives of a labor organization with headquarters at 7950 Jones Branch Dr., Suite 400S, McLean, VA 22021. ALPA represents over 80,000 pilots at 42 U.S. and Canadian airlines. ALPA is the duly designated and exclusive authorized representative of the pilots at Breeze under the RLA, 45 U.S.C. § 151, Sixth, and brings this action on behalf of itself and as the representative of the Breeze pilots. ALPA represents the approximately 600 Breeze pilots through a coordinating council composed of elected pilot representatives, the Breeze Master Executive Council ("MEC").

6.     Breeze is a commercial air carrier headquartered in Cottonwood Heights, Utah, with a principal place of business at 6340 S. 3000 E., Suite 400, Salt Lake City, UT 84121. Breeze is a "common carrier by air" within the meaning of RLA Section 201, 45 U.S.C. § 181. As such, labor relations at Breeze are governed by the RLA.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337

because this action arises under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, a federal statute

regulating commerce.

8.      ALPA's claims are also brought under the Declaratory Judgment Act, 28 U.S.C. §§

2201 and 2202, and the Association seeks a declaration as to the parties' rights and obligations

under the RLA. ALPA is entitled to such a declaration because the instant dispute is an actual and

existing controversy.

9.      Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) and (c) because:

Breeze has flight operations and pilots based in this District; Breeze's corporate headquarters are

in this District; and the events giving rise to this action took place, in whole or in part, in this

District.

## FACTUAL BACKGROUND

### The Railway Labor Act and Duty to Bargain in Good Faith

10.      The RLA imposes interlocking obligations on air carriers to foster effective collective

bargaining. Carriers must make "every reasonable effort to make and maintain agreements

concerning rates of pay, rules, and working conditions." 45 U.S.C. § 152, First. All disputes

between carriers and employees are to be considered and decided in conference between

management and union representatives. 45 U.S.C. § 152, Second. In addition, carriers are

prohibited from interfering, influencing, or coercing employees in the selection of their collective

bargaining representative, 45 U.S.C. § 152, Third, and a carrier is similarly prohibited from

"deny[ing] or in any way question[ing] the right of its employees to join, organize, or assist in

organizing the labor organization of their choice," and may not "interfere in any way with the

organization of its employees." 45 U.S.C. § 152, Fourth. Moreover, the RLA bans carriers from

maintaining, assisting, or contributing to a labor organization or "other agency of collective bargaining." *Id.*

11. Once the NMB certifies a union as the representative of a craft or class of a carrier's employees, the airline is required to "treat," *i.e.* negotiate, with that union and only that union to reach a CBA and resolve disputes over other work-related issues. 45 U.S.C. § 152, Ninth. These obligations collectively amount to an absolute duty to negotiate with a certified representative in good faith over all disputes arising from the employment relationship.

12. Courts have consistently recognized that if management ignores its RLA duty to act and negotiate in good faith with the chosen representative of its employees, it threatens a union's status as an exclusive bargaining representative. After all, refusing to bargain with a union is a refusal to recognize that status.

**Breeze Incorporation, ALPA Organizing Campaign, and NMB Certification**

13. Breeze began operations on May 27, 2021. Its CEO is David Neeleman, who also founded JetBlue Airways. Neeleman openly fought the JetBlue pilots' ALPA organization campaign. He also fought unionization campaigns by JetBlue flight attendants and Breeze flight attendants and dispatchers. His opposition to organized labor is well-known.

14. During the organizing campaign and before the NMB certified ALPA on August 11, 2022, Breeze demonstrated anti-union animus through its words and actions toward ALPA. Breeze's unbroken chain of anti-union animus included its baseless effort to reverse the NMB's certification in this Court and has continued to date, at the bargaining table and beyond.

15. Breeze pilots began to organize in the summer of 2021. At that time, a group of pilots secretly formed the Breeze Pilots ALPA Organizing Committee. The pilots organized because shortly after its launch, Breeze began to experience operational challenges which caused adverse effects to pilot working conditions. By fall 2021, pilot attrition was already a serious problem.

16.     Neeleman, ever wary of unionization efforts, provided for a nascent company union, the Breeze Pilot Committee ("BPC"), in the Breeze Pilot Playbook, management's unilaterally established pilot terms of employment. Pilots asked to stand up and participate in the BPC with the belief that they would have a voice to address their workplace concerns.

17.     Current Breeze MEC Chair Captain Alex Kluge was the BPC pilot representative for Breeze's Norfolk, Virginia base. But from its first meeting, the BPC pilots saw that Breeze did not take them or their input seriously, and that management expected them to blindly support all Company initiatives.

18.     Eventually, Captain Kluge and two of the other three BPC representatives secretly joined the Breeze Pilots ALPA Organizing Committee, although they continued to work with the BPC.

19.     On April 6, 2022, ALPA filed a showing of support with the NMB and the NMB then called for a representation election for the craft or class of Breeze Flight Deck Crew Members, *i.e.*, pilots. Breeze pushed to include pilot trainees as eligible voters, although the NMB had consistently held for decades that trainees who had never flown a revenue flight for an airline are not members of the class or craft of flight deck crew members, and are thus ineligible to vote in pilot representation elections. On June 8, 2022, the NMB authorized a mail-ballot representational election and rejected Breeze's contention that trainee pilots should be included in the craft or class.

20.     Once the NMB ordered a union election, Neeleman began to hold weekly all-pilot conference calls ("All-Pilot Calls") and on those calls repeatedly stated that there was no need for a union at Breeze and also denigrated ALPA, Breeze Pilots ALPA Organizing Committee, and ALPA supporters. These All-Pilot Calls continue to the present.

21.     In June 2022, Neeleman approached Captain Kluge and asked him to consider forming a company union instead of aligning with ALPA. Neeleman intended to create a full-fledged company union, distinct and separate from the BPC, called the Breeze Pilot Union.

22.     Captain Kluge, whose sole interest at the time was in improving working conditions for pilots, said he was open to the idea. The next day, after learning that the NMB had already ordered an election, Captain Kluge sent a text message to Neeleman, saying that given the turn of events, he did not think he could ethically remain open to a company union and said he hoped ALPA and Breeze could work together in the best interests of the pilots. Neeleman wrote back that not allowing trainee pilots to vote was "not ethical" and said he would be filing a federal lawsuit "next week" and threatened that "there will be no negotiations until the lawsuit and subsequent appeals have been exhausted which could take years." He also cautioned Captain Kluge not to be "more loyal to ALPA than your fellow pilots" and then immediately followed it with, "I should have added, please don't be more loyal to ALPA than your fellow pilots and to the person who started this company with tremendous sacrifice during COVID. I deserve another year."

23.     Captain Kluge understood Neeleman to be referring to Neeleman's repeated statements discouraging unionization and asking pilots to just "give" him a year to show that a union was not needed at Breeze. Neeleman had repeatedly stated that only "bad" companies needed unions and had in fact set up a website called "Give Breeze a Chance," specifically asking pilots to vote against unionization.

24.     On August 12, 2022, the NMB announced the results of the election: that a majority of eligible pilots voted in favor of ALPA. The NMB certified ALPA as the exclusive bargaining

representative for the Breeze Flight Deck Crew Members, pursuant to the RLA, 45 U.S.C. § 151 *et seq*.

25.     That same day, Breeze filed a lawsuit challenging the NMB's certification of ALPA in this Court, alleging "gross violations" of the RLA. ALPA filed an unopposed motion to intervene in the litigation and was added as a Defendant-Intervenor on October 11, 2022. Breeze's principal (and meritless) contention was that the NMB's long-standing definition of the pilot craft or class to include only those pilots who have operated a flight in revenue service was somehow unlawful.

26.     On May 23, 2023, this Court rejected Breeze's contentions and dismissed Breeze's complaint without prejudice.

27.     Breeze immediately appealed the decision to the Tenth Circuit, which affirmed on June 17, 2024. Neeleman publicly vowed to pilots on numerous occasions during the pendency of the litigation that he would not stop until ALPA's certification was nullified.

28.     On September 12, 2022, weeks after the NMB certified ALPA, Breeze General Counsel John Varley sent a memo to all Breeze pilots entitled, "Is there a legal requirement to pay dues?"

**Pre-Bargaining Proposals and Beginning of CBA Negotiations**

29.     Once certified, ALPA immediately sought negotiations over a first collective bargaining agreement. ALPA Director of Representation Andrew Shostack and interim MEC leaders met virtually with various representatives from Breeze management multiple times in fall 2022. The parties agreed to quickly set dates for bargaining but then disagreed about the frequency of negotiating sessions: ALPA wanted biweekly meetings for two days each, stating that anything less was too slow, and Breeze wanted three days a month but not consecutively, stating they would not be able to respond to proposals if parties met for two to three days in a

row. ALPA suggested in-person meetings and offered to travel to Utah. Although Breeze initially agreed to in-person meetings and suggested that the parties also have dinner when they were to meet, by November 2022, Breeze refused in-person negotiations and would only agree to virtual meetings.

30.     In September 2022, ALPA also sent two initial bargaining proposals: interim dues check-off and interim dispute resolution.

31.     Breeze responded in October 2022 that it did not want to sign the interim dispute resolution agreement; it wanted to handle grievances and discipline informally. The interim dispute resolution agreement would have given Breeze pilots protection against arbitrary discipline, including termination, through a negotiated dispute resolution process. To this day there is still no agreement on a negotiated dispute resolution process for the pilots. As disciplinary issues began to arise that fall, ALPA reiterated the need for an interim dispute resolution process agreement to management, but Breeze was and remains unreceptive and insists on maintaining a unilaterally imposed disciplinary review process.

32.     Protection against arbitrary discipline in a negotiated dispute resolution process is a standard feature of pilot labor agreements across the industry.

33.     Breeze did not respond to ALPA's September 2022 interim dues check-off proposal either. Under Section 2, Eleventh of the RLA, union membership is not required, and an employer may agree to deduct (or check-off) union dues from pilot paychecks upon individual authorization. Dues check-off agreements are also an industry standard. Breeze's outlier position weakens ALPA at Breeze and makes it more difficult for ALPA to support the Breeze pilots as they negotiate a first CBA.

34. On January 20, 2023, the parties met virtually for an introductory negotiation session. The three pilot volunteers who made up ALPA's MEC Negotiating Committee at the time, Captain Mark Kurdzel, Captain Tyler Pinkerton, and Captain Chris Muller, were accompanied by Shostack and ALPA Labor Relations Counsel Linelle Mogado. Breeze was represented by Varley and Chris Lewless, an attorney from Ford Harrison. Varley said that he wanted to have a good relationship but was plainly worried about the "changes" ALPA would bring. He also said that Neeleman had instructed him to challenge ALPA's NMB certification.

35. At this meeting, ALPA reiterated its interests in meeting in person and more than once a month for negotiations, as well as its desire to enter into written agreements related to creating a process for future collective bargaining with Breeze: a negotiations protocol agreement/ground rules, an interim flight pay-loss agreement, and the proposed interim dues-checkoff agreement sent to the Company in fall 2022.

36. Among other things, a negotiations protocol agreement sets dates for future negotiating sessions, which permits the parties to know in advance when they will meet and facilitates efficient planning. Such agreements are standard in pilot labor negotiations, especially since CBAs in the industry cover many topics from pay and employee benefits to scheduling and other work rules through pilot training and aviation safety issues.

37. ALPA labor agreements provide for flight pay-loss—an agreement where the carrier provides paid time off to employees for union-related duties for which ALPA in turn reimburses the company, which results in no economic cost to the company. ALPA requested an interim flight pay-loss agreement to have a process for the ALPA Negotiating Committee pilots to engage in CBA negotiations.

38.     In the January 20, 2023 meeting, Breeze said that its issue with granting an interim flight pay-loss agreement was that it did not have adequate pilot staffing.

39.     In the January 20, 2023, meeting, Breeze also responded to ALPA's proposed interim dues check-off agreement. Management represented that it had a lot of issues and changes to payroll and asked to delay implementing an agreement.

40.     Three years later, Breeze has still refused to negotiate an interim dues check-off agreement and has also indefinitely "parked" the dues check-off issue during contract negotiations.

**Early Bargaining: February to August 2023**

41.     In advance of negotiations later in February, on February 15, 2023, ALPA sent Breeze a written proposed protocol agreement for future negotiations.

42.     The parties met virtually again on February 21, 2023, for a one-day bargaining session. ALPA's team was the same. Breeze was represented by Varley, VP of Flight Operations John Russack, Assistant Chief Pilot Tom Bailey, and Director of Crew Resources Brittany Harney. The tone of this session was tense; Varley made a racist comment to Mogado, who is of Asian descent. Varley said Breeze would not sign ALPA's proposed negotiations protocol agreement/ground rules and asserted that a protocol agreement was not needed because they were "all adults." Harney admitted that the payment system difficulties Varley asserted in response to ALPA's September 2022 interim dues check-off proposal were not a problem and should not interfere with dues check-off proceeding. Russack and Harney both left the meeting at noon to attend Neeleman's weekly All-Pilot Call.

43. The parties continued to meet virtually for one or two days each month thereafter, but there was no progress on reaching agreements on proposed CBA sections, as Breeze refused to sign any tentative agreements ("TAs"). This stalling continued thereafter for many months.

44. As a general practice, the ALPA Negotiating Committee would meet for several days and up to a week to prepare for bargaining. The Committee would draft proposed CBA sections and documents or presentations to accompany their proposals and email them to Breeze's team in advance.

45. Breeze's continued refusal to agree to a negotiations protocol agreement/ground rules and interim flight pay-loss for the Negotiating Committee pilot volunteers had immediate, adverse bargaining consequences. Time was needlessly wasted with the parties making logistical scheduling arrangements to ensure the Negotiating Committee pilots' releases and replacement coverage.

46. Trying to find dates and get the Negotiating Committee pilots released from duty were among the biggest roadblocks to progress during this period and prevented the parties from meeting at all in March and June 2023. All of this would have been avoided had the Company agreed to a protocol agreement. The failure to do so predictably sabotaged negotiations.

47. The parties met in person at Breeze's headquarters for the first time in August 2023 and signed their first TA on an administrative matter, defining relative seniority among the Breeze pilots. The August 2023 meeting was the first meeting where Paul Carlson represented Breeze at the table instead of Lewless, and the ALPA Negotiating Committee characterized this session as "collegial" and productive, a welcome departure from the slow tempo of the previous sessions at that time.

48.     Carlson said aloud that Breeze would probably fire him for signing the TA. Indeed, just days later, Breeze fired Carlson and replaced him at negotiations with Breeze Chief Operating Officer ("COO") Mike Wuerger.

**Establishment of Pilot Playbook Committee During Negotiations**

49.     Although formal CBA negotiations were ongoing, in spring or summer 2023, Breeze renewed efforts to establish an alternate company-dominated organization, the "Pilot Playbook Committee" ("PPC") or "blue book committee" to address issues subject to collective bargaining. The PPC consisted of both management representatives and ALPA-represented rank-and-file pilots whom Breeze management hand-picked. The PPC was charged with reviewing and changing the Breeze Pilot Playbook, the handbook of management's unilaterally determined employment terms.

50.     The Company did not notify ALPA that it was seeking to establish a committee to negotiate terms and conditions of pilot employment alongside CBA negotiations and did not involve ALPA at all in the process. In so doing, Breeze refused to recognize ALPA as the exclusive bargaining representative of its pilots and signaled to the Breeze pilots that ALPA representation was meaningless and ineffective.

51.     Breeze management did not hide the purpose of the PPC; in fact, on an All-Pilot Call in 2023, Neeleman referred to the PPC as an "internal union" that, in particular, could facilitate changes to 401(k) elections—another subject management is required to bargain with ALPA.

52.     Carlson also sent an email to the PPC when he was still Breeze's chief CBA negotiator, stating that he wanted to address pilot scheduling and the Preferential Bidding System ("PBS"), which governs how pilots bid for flight schedules and thus impacts pilots' quality of work life.

53.     Scheduling (including design of PBS) is also a mandatory subject of bargaining.

54.    Neeleman disbanded the PPC around the time that Breeze terminated Carlson. Although the PPC itself was short-lived, the Breeze Pilot Playbook remains in effect and Breeze management continues to treat it as if it were a collective bargaining agreement—although it is not and may be changed by management at will.

**Breeze's Surface Bargaining in CBA Negotiations: Late 2023 to Present**

55.    While the parties executed a number of TAs between August 2023 and January 2024, they only reached five TAs over the course of 2024 and 2025. Pilot CBAs typically cover topics in thirty or more contract sections. Over three years, negotiations have led to TAs covering fewer than half of the proposed contract sections.

56.    Despite Breeze's first profitable quarter in spring 2024, it continued to make unilateral decisions both harmful and disrespectful to pilots, such as eliminating a minimum daily/pay guarantee.

57.    Pilots are scheduled to operate trip sequences over several days. To create incentives to schedule pilots efficiently and minimize their time spent away from home, many industry contracts establish minimum pay guarantees for each day of a trip sequence.

58.    By unilaterally eliminating the daily pay guarantee, Breeze undermined ALPA and degraded pilot working conditions. The daily pay guarantee falls under pilot compensation, another mandatory subject of bargaining.

59.    With an overwhelming majority of Breeze pilots in support, ALPA and the MEC held an informational picket at its Norfolk base on May 7, 2024, to protest Breeze's decision. The picketing generated media attention to ALPA's representation of the Breeze pilots and focused on outstanding issues in the ongoing negotiations.

60.    Neeleman was furious over the picket. In response to Captain Kluge's communication to the pilot group calling for a picket, Neeleman sent Captain Kluge a series of text messages in

14

which Neeleman called Captain Kluge a "liar," "so offensive," and "ungrateful." Neeleman was especially offended that Captain Kluge characterized Neeleman's All-Pilot Calls as an attempt to "create the illusion that senior management was interested in creating a better airline for the pilots." Neeleman also blamed ALPA as the cause of alleged financial troubles at other carriers it represents.

61.    Since ALPA's informational picket, the parties have continued to just meet once a month for negotiations, usually in person at Breeze's headquarters, for two to four days at a time.

62.    One reason for slow progress at the bargaining table is Breeze's aforementioned refusal to negotiate over a protocol agreement/ground rules and its decision to "park" (*i.e.*, indefinitely postpone) consideration of other CBA sections usually negotiated early on and regarded as foundational, such as: Section 1 - Recognitions and Job Security[1], which ALPA passed on May 23, 2024; a Letter of Agreement ("LOA") for Interim Dues Check-Off, which ALPA passed on February 21, 2023; Section 29 - Agency Shop and Dues Checkoff ("DCO"), which ALPA passed on October 25, 2023; and an LOA for Interim Flight Pay-Loss ("FPL"), which ALPA passed on February 21, 2023.[2]

63.    As Breeze has held steadfast to its position that no ground rules are needed for negotiations, logistical planning has, predictably, continued to hinder the parties' substantive negotiations to this day. Without ground rules, ALPA needlessly spends considerable time

---

[1] Recognition and Job Security, also known as "Scope" in other ALPA-bargained CBAs, is always Section 1 because it defines what constitutes "company flying"—flying that must be done by unit pilots, which is inexorably tied to job security.

[2] Additional CBA Sections that the parties are still negotiating include: Section 2- Definitions (In Development); Section 3- Compensation (To Be Developed); Section 5- Travel Expenses; Section 6- Moving Expenses; Section 7- Vacations; Section 9- Commuter Policy (To Be Developed); Section 11- Training (Company Response Pending as of December 18, 2025); Section 12- Hours of Service (In Development); Section 13- Leaves of Absence; Section 25- Scheduling (In Development- Interest Based Bargaining began on November 18, 2025); Section 26- General (In Development- Constant Working Document); Section 27- Insurance Benefits (ALPA Response Pending as of October 24, 2025); Section 28- Retirement (ALPA Response Pending as of December 17, 2025); Section 31- Duration (In Development).

negotiating the release of pilot representatives for bargaining rather than negotiating over contract terms.

64.    In the absence of an interim flight pay-loss agreement and ground rules, Breeze also frustrates the release of ALPA volunteers by treating any days used for official union duties—"ALPA Days"—as regular days off when determining schedules. Under an industry-standard flight pay-loss agreement, pilots involved in contract negotiations would drop scheduled flying with pay and ALPA would reimburse the carrier for those costs.

65.    Breeze's stance penalizes pilots for volunteering for union work. Under the Breeze Pilot Playbook, pilots are to receive 12 regular days off a month but Breeze counts pilot volunteers' ALPA Days toward their regular days off.

66.    For example, Negotiating Committee member Captain Jason Pena only received five regular days off in October 2025, seven in August and December 2025, and nine in September and November 2025 because Breeze counted his bargaining days as regular days off and/or awarded vacation days to run concurrently with ALPA days.

67.    Breeze also regularly refuses to release ALPA subject matter experts ("SMEs") from pilot duty who are needed for bargaining specific sections, such as scheduling, under the guise of operational needs. However, the Company has never demonstrated an actual operational need. It has refused to release SMEs during months when the airline was so overstaffed it offered unpaid "Breeze Breaks" to pilots who volunteered to stay home.

68.    ALPA's Negotiating Committee thoroughly prepares before each negotiating session, sometimes for a week or two, and continues to draft comprehensive proposals.

69.    In December 2025, Breeze refused to release all Negotiating Committee members from duty for bargaining preparation days in March 2026 and thereby cancelled ALPA's entire

preparation session for March 2026. Breeze alleged that it made its decision because of operational needs due to March Madness charter flying, even though Captain Kurdzel, who is a charter pilot on the Negotiating Committee, pointed out that Breeze would approve him for vacation days during that same time period. Indeed, Breeze did offer vacation slots for the 2026 March Madness season.

70.     To date, in over three years of bargaining, Breeze has yet to initiate a single proposal.

71.     After ALPA sends a proposal to Breeze, the parties will bargain in person over the language, always at Breeze headquarters. Despite ALPA's careful work on proposals, Breeze will often "pass" back the proposal without substantive comment or a counter proposal, other than striking out all of ALPA's proposed language changes.

72.     In addition, Breeze does not provide data to support its bargaining positions at the negotiating table and instead relies on bare and conclusory statements.

73.     For example, Breeze stonewalled ALPA when bargaining over hotel issues, which are critical to pilot working conditions, as pilots spend many nights on trip sequences away from home. Breeze's team rejected ALPA's initial proposal on the basis that the language was too prescriptive. But when ALPA came back with less prescriptive language but proposed an equal role for ALPA for the Breeze Hotel Committee (the purpose of which is to resolve disputes between the parties), at the end of July 2025, Breeze rejected that industry standard concept out of hand as well.

74.     Breeze has also repeatedly crossed out significant portions of ALPA proposals in their entirety without countering the proposal or providing alternative solutions. The Company has done this with several sections, such as retirement and insurance. For example, on information and belief, in fall 2025, Nancy Holt, the current Ford Harrison attorney on Breeze's negotiation

team, once crossed out all the language of a pass 15 minutes before a bargaining session without offering a counter or an explanation for the Company's position.

75.     In November 2025, Holt also openly stated that the parties are under no obligation to abide by TAs while first contract negotiations are ongoing.

76.     The Company's position that it is free to ignore what it has agreed to in negotiations pending a final CBA undermines the stability of labor relations at Breeze as well as both the bargaining process and the Association, as it signals to Breeze pilots that ALPA is ineffective.

77.     Breeze has often canceled sessions or otherwise refused to meet with ALPA's Negotiations Committee. ALPA, on the other hand, has conscientiously prepared and flown its scheduling and benefits SMEs to bargaining sessions in Utah, only to have Breeze cancel the sessions, or to only meet for half a day out of four or five planned full-day sessions.

78.     In November 2025, in response to Captain Kurdzel's email to Breeze's negotiation team to confirm the next week's four scheduled days of in-person bargaining and the agenda for each day, without providing an explanation, Wuerger wrote he would not be in the office, and that the parties would not be meeting on Tuesday. He subsequently said he would be absent for half of the day on Wednesday and Thursday too.

79.     In fall 2025, ALPA passed retirement and insurance bargaining proposals to Breeze and for each proposal, the Company refused to even agree to maintain the current conditions (reflected in the Breeze Pilot Playbook) regarding numerous provisions and implied that they did not need to negotiate over these sections because they were already "covered" in the retirement plan and insurance plan documents. Of course, all of those provisions are rules and working conditions of employment which Breeze is under an obligation to bargain with ALPA under the RLA. Breeze's refusal to do so violates its RLA bargaining obligations.

80.     In December 2025, Breeze made this same bogus argument about pilot 401(k) benefits. The Company reiterated that it did not need to negotiate with ALPA over 401(k) benefits since it was "all in the plan documents." This position was wholly disingenuous. When Neeleman saw that the pilot group was upset about those current benefits, he changed his tactic. Later in December 2025, Neeleman approached Captain Phil Collings, the then-MEC Secretary-Treasurer, and said he wanted to improve Breeze's 401(k) plan and that maybe Breeze and ALPA should sign a LOA on it.

**Breeze's Refusal to Treat and Negotiate with ALPA: Union Bypass and Direct Dealing**

81.     Breeze's standard practice has been and continues to be to refuse to recognize ALPA's existence and its role as the Breeze pilots' exclusive bargaining representative. Breeze even refuses to refer to ongoing CBA negotiations with ALPA. Instead, Breeze leaders and managers consistently tout and refer pilots to its Pilot Playbook. Even when the parties have a TA on a subject, Breeze does not acknowledge it.

82.     As previously noted, Breeze management has also explicitly and recently stated that Breeze is under no obligation to honor bargained TAs prior to a first CBA's effective date.

83.     Neeleman continues to regularly use his weekly All-Pilot Calls to directly deal with pilots, bypassing and undermining ALPA. Although MEC representatives may attend these calls, Neeleman does not recognize them or their roles as union representatives.

84.     During the weekly All-Pilot Calls, Neeleman often introduces new business initiatives, makes announcements on mandatory subjects of collective bargaining, and/or discusses subjects on which the parties have already reached agreement (TA'd). In doing so, Neeleman disregards ALPA's representation status and directly communicates its message to pilots that the bargaining process with ALPA does not matter and that the Association is of no import to the pilots.

85.    In the last few months, Breeze unilaterally changed rules and working conditions without regard to any TAs or ongoing contract negotiations.

86.    Breeze refuses to publicly acknowledge ALPA. Airline Pilot Central (www.airlinepilotcentral.com) is an online database of comprehensive and up-to-date information on over 100 airlines that pilots use. Included in the airlines' profiles are pay scales, retirement benefits, and whether the property has union representation. On information and belief, the website only allows airline management to submit updated information regarding their respective airlines.

87.    Breeze has a profile on Airline Pilot Central, and its profile was last updated on or around December 19, 2024. Breeze's profile has "None listed" under the "Union" heading.

**PC-12**

88.    Over numerous months in 2025, Neeleman discussed his intention on weekly All-Pilot Calls to acquire a single-engine PC-12 aircraft to "deadhead" Breeze pilots.

89.    "Deadheading" refers to repositioning pilots from (or to) a base of operations as passengers.

90.    ALPA and Breeze reached a TA on deadheading in October 2024, which requires that the Company only deadhead pilots on multi-engine jet aircraft. This is a standard provision in pilot contracts across the industry.

91.    The PC-12 is not a multi-engine jet aircraft.

92.    When ALPA heard of Breeze's intention to acquire a PC-12 for deadheading in June 2025, Captain Kurdzel requested information from Breeze. Breeze's Chief Negotiator Wuerger responded that it was just an idea and there was no information to share, but that Breeze would keep the MEC apprised.

93.      However, without notifying ALPA, a few months later, in September 2025, Breeze unilaterally posted a vacancy announcement for a pilot to fly a PC-12. ALPA believed the announcement itself violated the Seniority TA, and the acquisition and posting of the vacancy violated the Deadheading TA.

94.      In addition to violating the letter and spirit of the TAs, ALPA was concerned about the safety issues involved with single-engine aircraft. Deadheading of ALPA pilots is uniformly done by commercial carriers (such as Breeze) whose operations are under Part 121 of the Federal Aviation Regulations. Part 121 is the "gold standard" of aviation safety, and ALPA as a union and aviation safety organization, has long taken the position that crew member passengers are entitled to the same level of safety as the flying public.

95.      Around October 21, 2025, Breeze management emailed the 35 pilots assigned to a virtual base via the "Virtual Base Program" ("VBP") about its intention to both expand the VBP and assign all the VBP pilots to be available and eligible for a PC-12 "rescue" program, in which they would fly PC-12s to rescue and recover aircraft in need of maintenance or otherwise out of service. Acknowledging that this was a huge change to the VBP and that it was unfair to change the VBP after pilots already had bid to it, management nonetheless said it would proceed with the program. Management's email also said that "David [Neeleman] wants this program designed and written yesterday," attached a survey, and asked the pilots to respond to the survey as soon as possible.

96.      Surveying union-represented pilots constitutes another bypass of the Association; in this case, Breeze reached out to the pilot group behind ALPA's back to gain support for its proposed actions. A few days later, during a negotiation session, Wuerger relied on the results of management's pilot survey and claimed that 68 percent of all pilots did not have safety concerns

about PC-12 flying. In raising this "data," Wuerger tried to induce ALPA to agree to revise the terms of the Deadheading TA.

97.     After the MEC criticized Breeze's actions regarding the PC-12 in communications to the pilot group, on October 28, 2025, Neeleman announced on an All-Pilot Call that Breeze would not be moving forward with the PC-12 acquisition and trivialized ALPA's concerns as a "little heartburn."

### LearJet 45 Captain Position

98.     On or around December 1, 2025, Breeze management posted a job notice for LearJet 45 Captains in Charleston, SC. The job posting violates the purpose of the TA'd Section 8 for Deadheading because the LearJet (like the PC-12) is not an aircraft used in normal commercial airline service or subject to normal commercial airline safety standards.

99.     During negotiations for TA'd Section 8 Deadheading, the parties discussed the use of commercial aircraft for deadheading and assumed the use of commercial aircraft owned by Breeze or other airlines when agreeing to particular subsections on seating accommodations, booking, Alternate Deadheads, and Self-Deadheads. The parties never discussed the LearJet 45 during those negotiations and using it to deadhead pilots would be flatly inconsistent with several subsections in that TA.

### Sick Leave TA

100.    The parties reached a TA on sick leave in April 2025. During negotiations over sick leave, Breeze proposed a program where pilots could convert their sick bank time to paid time off. ALPA rejected that proposal and Breeze's proposal was not included in the TA. Nonetheless, in November 2025, Breeze management notified all pilots that it was unilaterally establishing the very same conversion program that ALPA had previously rejected in negotiations.

101.    Management's willingness to ignore the terms of a TA clearly communicates to Breeze pilots its disregard for ALPA and its RLA bargaining obligations.

### Demonstrations of Anti-Union Animus

102.    Since its inception, Breeze, led by Neeleman, has been clear about its disdain for ALPA and collective bargaining.

103.    During weekly All-Pilot Calls, Neeleman takes every opportunity to ignore ALPA's existence as an exclusive bargaining representative and/or to openly denigrate ALPA. Neeleman regularly disparages the contracts at other ALPA carriers on these calls, especially Spirit Airlines.

104.    In or around September 2025, in praising a Breeze pilot, Neeleman stated that the pilot went "above and beyond" and specifically highlighted that this pilot "disregarded" ALPA.

105.    In or around November 18, 2025, during a weekly All-Pilot Call, Neeleman advised that Breeze would begin surveillance of pilots. Breeze is rolling out AI cameras at the Breeze gate in Provo, Utah, to spy on its employees, including ALPA pilots. Neeleman stated that his goal is to "have a [sic] AI camera on every Breeze turn to keep everyone focused." This surveillance program will also facilitate management coercion and interference with pilots exercising their right to organize or otherwise engage in RLA protected activities.

106.    Around April 2022, when ALPA filed for a union election with the NMB, Neeleman began regularly attending new pilot orientations and continues this practice to the present day. At orientations, he regularly chills union participation through his conduct and words. Neeleman refuses to recognize or acknowledge ALPA's status by repeatedly saying that ALPA is not "on property," a false characterization, as ALPA has been certified as the pilots' representative by the NMB, a certification affirmed by this Court and the Tenth Circuit.

107.    On information and belief, in or around August-September 2025, Neeleman called the pilots who voted for ALPA representation "assholes" in a speech to new hire pilots. Neeleman's

vulgar epithet for Breeze pilots who exercised their RLA right to support ALPA shows the depth of his and management's contempt for its legal obligations to recognize and bargain with ALPA as the representative of Breeze pilots.

108.    Neeleman's consistent and repeated demonstrations of anti-union animus, as well as the threat of constant surveillance, have had the intended effect. In December 2025, a Breeze pilot told an ALPA MEC representative that the only reason he had not yet joined ALPA was because of Neeleman's anti-union statements over the years and fear of retaliation.

109.    In December 2025, via text message, a management official denied a MEC officer's request to attend a meeting after confirming that the meeting was related to his ALPA duties. The management official stated that "MW will lose his mind" if the meeting was ALPA-related and upon confirming that it was, wrote, "Ugh. Buddy … it's squashed. Sorry. You know MW and DN's disdain for ALPA … Out of our hands." "MW" is Breeze COO Mike Wuerger, and "DN" is David Neeleman.

110.    The MEC has a Scheduling Committee which advocates for pilot schedules that prioritize safety, work-life balance, and operational efficiency. Since November 2023, the MEC Scheduling Committee has met with Breeze's Scheduling and Planning management to develop and evaluate pilot pairings, PBS, and Day of Operations scheduling.

111.    The MEC also has a PBS Committee, which acts as an advisory board to Breeze management. Specifically, the PBS Committee advocates for schedule improvements for pilots, particularly the PBS schedule build, also known as the "solve." The PBS Committee provides input and advocates for improvements, but its agreement is not necessary for management to approve pilot schedules, so, it is not an equal partner to Crew Scheduling management. Breeze Crew Scheduling retains full authority over the final schedules.

112.    On December 3, 2025, the Breeze MEC issued a newsletter entitled "ALPA's Role in the PBS Solve." Therein, the MEC notified pilots of the PBS Committee's limited role in advising and advocating regarding the PBS schedule build (PBS Solve). The last two sentences stated: "In summary, your PBS Committee is an advisory body, not a decisionmaker, and not an equal partner in this process. We will continue working toward an equal seat at the table as we move forward in securing our first Collective Bargaining Agreement (CBA)."

113.    This newsletter also outlined that the PBS Committee continues to push for changes that improve flexibility, work-life balance, and align with industry standards. It further outlined the improvements that the ALPA PBS Committee wants from management.

114.    On or around December 4, 2025, Breeze management terminated the monthly scheduling calls with the MEC Scheduling Committee. On information and belief, Breeze's actions were in retaliation for the December 3, 2025 MEC newsletter. This cancellation cut off a key channel for addressing pilot scheduling issues and demonstrates Breeze's clear lack of interest in collaborating with ALPA.

115.    Although senior management is continuing to allow the PBS Committee to advise on the monthly pilot schedule builds (PBS solve), those meetings have deteriorated over time and management continues to reject any meaningful input and advice from the PBS Committee. As an example, management has promised to allow the MEC access to PBS software to run alternative schedule solves—a standard practice at most ALPA carriers—but has yet to follow through on its promise. Another empty promise that shows Breeze's unwillingness to recognize ALPA as the pilots' representative.

**CAUSES OF ACTION**

**Count One: Violation of RLA Section 2, First (45 U.S.C. § 152, First) Failure to Exert
Every Reasonable Effort to Make Agreements
and to Settle all Disputes in Good Faith.**

116.    This count incorporates by reference each of the preceding paragraphs as if set forth

fully herein.

117.    Three years into CBA negotiations, the parties have reached TAs on only a fraction of

necessary contract issues. The TAs reached mostly concern the administrative sections of a CBA

(such as defining relative pilot seniority) and the Company has also refused to enter into interim

agreements or LOAs.

118.    As a general practice, Breeze has engaged in surface bargaining and other delay

tactics throughout the three-year period, failing to meet its duty under RLA Section 2, First,

which imposes a duty on carriers "to exert every reasonable effort to make and maintain

agreements concerning rates of pay, rules, and working conditions, and to settle all disputes,

whether arising out of the application of such agreements or otherwise, in order to avoid any

interruption to commerce or to the operation of any carrier growing out of any dispute between

the carrier and the employees thereof." 45 U.S.C. § 152, First.

119.    Breeze has engaged in the mere pretense of negotiation and adopted evasive and

dilatory tactics that show an intent to wait until ALPA rolls over and the pilots abandon their

support of the Association. Breeze has displayed a disregard of ALPA's status as the certified

bargaining representative of the Breeze pilots and a hostility toward the collective bargaining

process, shown among other things by its frustration of the negotiation schedule in refusing to

release pilots for negotiations, insisting on scheduling infrequent negotiation sessions, and

repeatedly attempting to implement deadheading on non-compliant aircraft (efforts it knew were

completely unacceptable to ALPA and contrary to TAs previously reached), all of which evinces an intent not to reach agreement on a CBA.

120.    At best, Breeze has shown a fundamental institutional commitment to frustrate bargaining with ALPA and has repeatedly taken an overall posture and engaged in conduct that can only be described as going through the motions at the bargaining table—the hallmark of bad faith bargaining in violation of its obligations under Section 2, First of the RLA.

121.    By engaging in the foregoing conduct, which has continued through this date, Breeze has violated and continues to violate its duty under Section 2, First of the RLA.

**Count Two: Violation of RLA Section 2, Second, Third, Fourth, Ninth (45 U.S.C. § 152, Second, Third, Fourth, Ninth) Failure to Treat ALPA as Representative**

122.    This count incorporates by reference each of the preceding paragraphs as if set forth fully herein.

123.    RLA Section 2, Second, provides, "All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute." 45 U.S.C. § 152, Second.

124.    RLA Section 2, Third provides that "Representatives … shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its

employees as their representatives of those who or which are not employees of the carrier." 45 U.S.C. § 152, Third.

125.    RLA Section 2, Fourth provides that "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees." 45 U.S.C. § 152, Fourth.

126.    RLA Section 2, Ninth provides that "[u]pon receipt of such certification [by the NMB of a labor organization as the representative of a craft or class of its employees] the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter." 45 U.S.C. § 152, Ninth.

127.    The duty to treat also encompasses a prohibition on directly negotiating with union-represented employees over matters that are the subject of collective bargaining absent the union's agreement.

128.    Breeze has steadfastly refused to treat with ALPA since ALPA's certification, which triggered Breeze's duty to do so under Section 2, Ninth. The Company has established several iterations of company unions, vestiges of which still exist.

129.    For example, although Breeze disestablished the PPC in 2023, the Breeze Pilot Playbook itself is treated by Neeleman and Breeze as if it were a bargained-for CBA and Neeleman tasks pilots he chooses to update the Playbook. The Playbook in use today still references the BPC (disestablished in 2022) but does not mention ALPA.

130.    In December 2025, when Neeleman disingenuously suggested that the parties negotiate a LOA on 401(k) to Captain Collings, Neeleman feigned ignorance over the fact that Breeze's bargaining representatives had just refused to substantively negotiate over the retirement section of the CBA, likely at his direction, and that Breeze had only signed one LOA since ALPA was certified.

131.    Breeze's calculated bad faith stifling of negotiations is part of its plan to demonstrate ineffectiveness of ALPA and the RLA bargaining process to its pilots as part of its goal to cause ALPA's decertification as the Breeze pilots' bargaining representative.

132.    Neeleman has, through words and actions, bypassed and refused to acknowledge the union's role or presence in his direct dealing on All-Pilot Calls and in other communications when he has announced new programs, policies, and/or other changes to working conditions—undermining the Association as part of Breeze's plan to cause ALPA's decertification as the representative of Breeze pilots.

133.    Through the foregoing pattern and practice and course of bad faith conduct, which continues to the present, Breeze has violated and continues to violate Section 2, Second, Third, Fourth, and Ninth of the RLA.

**PRAYER FOR RELIEF**

WHEREFORE, ALPA respectfully requests that this Court:

A.    Issue a judgment declaring:

1.    The rights and obligations of the parties to bargain in good faith under the RLA;

2.    That Breeze has violated its obligations under Section 2 First, Second, Third, Fourth, and Ninth of the RLA by bargaining in bad faith throughout, from the time

29

the NMB certified ALPA, thereby undermining the RLA bargaining process and ALPA as certified bargaining representative of the Breeze pilots.

B.    Issue permanent injunctive relief requiring:

1.    Breeze to bargain in good faith with ALPA;

2.    Breeze to cease its interference with the pilots' exercise of their organizational rights;

3.    Breeze to cease its efforts to undermine and destroy ALPA's standing, effectiveness, and functioning as the pilots' chosen bargaining representative;

4.    Breeze to cease its direct dealings with its pilots rather than through ALPA;

5.    Breeze to cease addressing mandatory topics of collective bargaining through Company-sponsored committees and to deal exclusively on such subjects with ALPA as the pilots' bargaining representative;

6.    Breeze to disestablish any other non-ALPA pilot committee;

7.    By a date certain, Breeze and ALPA to submit to the Court an agreement specifying pre-determined dates and times for in-person negotiations; and

8.    Breeze and ALPA to report to the Court every sixty (60) days with respect to the status of those negotiations.

C.    Issue a judgment awarding such additional and further relief, as determined by the Court, including reasonable costs and attorneys' fees ALPA has incurred in bringing this proceeding.

DATED this 20th day of January, 2026.

**SCHOLNICK THORNE HOLLAND**
/s/ Jonathan K. Thorne
Jonathan K. Thorne
Attorney for Plaintiff